# Supreme Court of Texas

━━━━━━

No. 22-0978

━━━━━━

In the Interest of R.R.A., H.G.A., H.B.A., Children

━━━━━━

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

━━━━━━

**Argued September 12, 2023**

JUSTICE BLAND delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Boyd, Justice Devine, Justice Huddle, and Justice Young joined.

JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Busby joined.

The Family Code authorizes the termination of parental rights when a factfinder decides that (1) a parent's conduct has met a statutory ground for termination; and (2) termination is in the child's best interest. Several grounds for termination, like the ones at issue in this case, require the factfinder to conclude that the parent's conduct endangered the child.

This appeal concerns the causal connection between a parent's illegal drug use and a child's endangerment. Concluding that the facts established such a connection, the trial court terminated the father's rights under both general endangerment and drug-use grounds. In a

split decision, however, the court of appeals reversed. The panel majority concluded that the Department of Family and Protective Services had failed to prove harm to the children as a direct result of their father's methamphetamine use. [1] The dissenting justice would have held the evidence sufficient to conclude that the father's illegal drug use endangered his children.[2]

We reverse the court of appeals' judgment for two reasons. First, the court failed to apply the meaning of "endanger" for illegal-drug-use cases we announced in *In re J.O.A.*[3] In *J.O.A.*, the Court defined "endanger" to include a substantial risk of harm to the child, giving the word its ordinary meaning and following the Court's longstanding definition of endangerment pronounced in *Texas Department of Human Services v. Boyd.*[4] Second, the court of appeals improperly disregarded evidence supporting the trial court's finding that the father used illegal drugs in a manner that created a substantial risk of harm to his children—evidence that the trial court, as factfinder, could properly credit.

## I

## A

After conducting an investigation from January to March of 2020, the Department removed Father's three children, one-year-old twins (a

---

[1] 654 S.W.3d 535, 550 & n.4 (Tex. App.—Houston [14th Dist.] 2022).

[2] *Id.* at 558 (Zimmerer, J., dissenting).

[3] 283 S.W.3d 336, 345 (Tex. 2009).

[4] 727 S.W.2d 531, 533 (Tex. 1987).

boy and a girl) and a three-year-old daughter.[5] At the time of removal, Father and the children had been homeless for two months and were living in Father's car after their grandmother, Father's mother, decided that they could not live with her.[6] During the investigation, Father submitted to a drug test and tested positive for methamphetamine. The Department placed the children in foster care after Father's mother indicated that she could not care for them. Father again tested positive for methamphetamine in April.

In May, the trial court approved the Department's service plan and ordered Father to comply with it. As part of the plan, the Department reported that the children (in foster care at the time) were in good health. The service plan mandated a drug-use assessment to guide Father's subsequent treatment and drug-testing requirements. The plan stated that missed drug tests would be deemed to show positive results. In June, Father tested positive for methamphetamine yet again in a hair-follicle test, though Father's urine test on the same day was negative.

Father initially followed the family service plan. After testing positive in June, Father had a string of five negative urine tests and one negative hair-follicle test. Father also completed outpatient drug treatment on August 19, 2020.

---

[5] Mother abandoned the family at the time of the first removal. Mother's rights were terminated at the same time as Father's, and she did not appeal.

[6] Father acknowledged these circumstances in a family service plan admitted as an exhibit at trial.

3

Based on these promising events, in September the trial court placed the children with Father's mother, who at that point agreed to care for them, and it permitted Father to have supervised visitation with the children while they were in her care.

In October, however, Father tested positive for marijuana use. Because of this test result, the Department requested that Father complete another substance abuse assessment. The new assessment recommended that Father complete further outpatient drug treatment. The court-mandated family service plan required Father to follow the recommendations of these substance abuse assessments.

When faced with further outpatient treatment, Father stopped complying with the plan. Father refused treatment and every subsequent court-ordered drug test. Father missed his drug test scheduled for November 2020. Although Father attended his December test, he arrived with his body hair completely shaved, making a hair-follicle test impossible.

That February, the children's grandmother drove herself to the hospital, where she was admitted and remained for eight days. Upon learning that the children had been left with Father unsupervised, which violated the court's orders, Father's sister notified the Department that she was concerned for the children. Distressed that his sister called the Department, Father became agitated and threatened to kill himself if the Department returned the children to foster care.[7]

_____

[7] The police report and hospital intake form specify that Father made his suicide threat in front of the children. Father admits that he made the threat but disputes that he did so in front of the children.

Alarmed by Father's threat, Father's sister called the police. Upon arriving at the grandmother's house, the police found a woman—Father's visitor—hiding in a closet. Police arrested her after she provided false identification; further, they discovered both methamphetamine and drug paraphernalia in her purse. The police brought Father to a psychiatric hospital where he was admitted and diagnosed with anxiety and depression. The trial court ordered the children returned to foster care after this incident.

While in the psychiatric hospital, Father tested negative for drugs in a urine test; the hospital has no record of a hair-follicle test. This urinalysis is the last drug test in the record that Father completed. According to the caseworker's testimony, Father did not respond to monthly emails about resuming drug testing or otherwise correspond with the caseworker. He missed another court-ordered test in March.

The only pretrial contact the caseworker had with Father between his February hospitalization and the September trial occurred in May and June of 2021. After several months of being unable to reach Father, the caseworker asked the children's grandmother about Father's whereabouts, and Father called the caseworker later that day. The two scheduled a visit between Father and the children for early June. The Department cancelled the visit, however, on the recommendation of the oldest child's therapist.

The trial court reinstated Father's visitation rights at the end of June 2021, but Father never again responded to communications about scheduling further visits, nor did he independently inquire about his children's health and well-being. Father claims that he did not respond

because he did not own electronic communication devices and was able to communicate electronically only in May and June when he briefly had access to a tablet. The caseworker explained that the Department had sent drug-testing notices to Father's attorney in addition to Father, and the Department used email to contact Father because phone contact had proved unreliable. From the end of February to the start of trial in September, Father never visited the children or communicated with the caseworker except about the cancelled June visit.[8]

Father missed another court-ordered drug test during June and was absent from the first day of trial at the start of September.

**B**

The Department sought termination of Father's parental rights under Section 161.001 of the Texas Family Code. Subsections (b)(1)(D), (E), and (P) are at issue in this appeal. Section 161.001(b)(1) provides that a trial court may terminate a parent–child relationship if the court finds by clear and convincing evidence that the parent:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which *endanger* the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which *endangers* the physical or emotional well-being of the child; [or]

> . . . .

---

[8] Father testified that there were four cancelled visitations around the same time, not one. Even crediting that testimony, he did not attempt to visit the children after the June visitation reinstatement.

6

(P) used a controlled substance, as defined by Chapter 481, Health and Safety Code, *in a manner that endangered the health or safety of the child*, and:

(i)     failed to complete a court-ordered substance abuse treatment program; or

(ii)    after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance.[9]

Father testified that he had a loving relationship with his children, he had never endangered or harmed them, and the children's grandmother would help him care for them as he searched for employment. He conceded, however, that he did not communicate with the Department after the court reinstated his visitation privileges in June 2021. He agreed that he did not provide the Department with any indication that he had stable housing and testified he was currently living with a friend. He admitted his lack of participation in required drug tests from October 2020 to September 2021 gave the court no way of knowing whether he was drug free. Representatives from the Texas Alcohol and Drug Testing Service validated records of Father's drug-testing history.

The caseworker conceded that, to her knowledge, Father had never physically harmed the children, and she had no reason to believe that he had threatened the children when he threatened self-harm during the incident leading to the second removal. Father kept

---

[9] Tex. Fam. Code § 161.001(b)(1)(D), (E), (P) (emphases added).

7

consistent contact with his children while the children resided with their grandmother, but that had ended upon the second removal.

The caseworker pointed out that Father had refused to drug test for nearly a year as the service plan required, beginning in October 2020 to the time of trial in September 2021; he was homeless with the children and tested positive for methamphetamine at the time of the first removal and had yet to secure stable housing; he had threatened self-harm in front of the children, leading to his hospitalization; and he had permitted someone who possessed methamphetamine and drug paraphernalia in his mother's house while he was caring for the children unsupervised against court orders. The grandmother "expressed previously she did not want long-term care of the children," including after her return from the hospital, and the Department had concerns of "instability, as far as [the grandmother] saying she will and she will not" care for the children.

The children's grandmother testified that she had never seen Father endanger the children and that the children and Father had a close relationship. She explained that, while she told the Department after her hospitalization that she could not care for the children, she was in better health and felt capable of caring for them now. She said she would allow Father to stay with her as necessary to support the children. She also claimed that her two daughters were now willing to help. She admitted that she did not communicate with the Department from May until the week before the September trial.

8

At the close of evidence, the trial court found that termination was appropriate under Section 161.001(b)(1)(D), (E), and (P) and that termination was in the children's best interest.

## C

The court of appeals reversed and rendered judgment for Father. The majority held that the evidence presented at trial was legally insufficient to support termination of Father's parental rights on all three grounds.[10] Drug use alone, it held, could not result in termination under (D) or (E), citing its own opinion in *In re L.C.L.*[11] Rather, it held, the statute requires that the Department prove a direct causal link between the parent's drug use and harm to the child.[12] In its view, the Department failed to adduce any evidence of such a link.[13]

Isolating each non-drug piece of evidence favoring termination, the court of appeals further held that the trial court could not have credited any of it to support a finding of endangerment, including homelessness; a lack of stable employment; a past conviction for assault of a family member;[14] the failure to visit his children for more than six months; and his visitor's possession of methamphetamine and drug paraphernalia at a time he was caring for the children. The court of

---

[10] 654 S.W.3d at 550.

[11] *Id.* at 548 (citing *In re L.C.L.*, 599 S.W.3d 79, 84–86 (Tex. App.— Houston [14th Dist.] 2020, pet. denied) (en banc)).

[12] *Id.* at 546, 550 (citing *L.C.L.*, 599 S.W.3d at 84–86).

[13] *Id.* at 550, 553.

[14] At trial, the Department limited its use of Father's 2013 conviction to the best-interest analysis.

9

appeals concluded that none of these facts, standing alone, supported termination under the general endangerment grounds (D) or (E). This was so, the court held, because no one piece of evidence proved that Father had placed the children in an endangering environment.[15] The court acknowledged that the Department relied on these factors in the aggregate to demonstrate an endangering course of conduct, but it nonetheless concluded that the evidence was "insufficient and undeveloped" and "present[ed] no more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."[16] It refused, for example, to credit methamphetamine use in temporal connection with Father's lack of housing and employment at the time of the Department's initial removal of the children.

The court of appeals applied the same direct-harm causal-link requirement from its (D) and (E) analysis to subsection (P) because "nothing in the Family Code provid[es] that the causal link required to support termination under predicate grounds (D) and (E), as explained in [the appellate court's] decision in *L.C.L.*, is inapplicable to termination under predicate ground (P)."[17] Because no direct causal link existed between Father's drug use and endangerment of the children, it held, the evidence was also legally insufficient to support termination under (P).[18]

---

[15] *Id.* at 549–53.

[16] *Id.* at 553.

[17] *Id.* at 550 n.4.

[18] *Id.* at 550 & n.4.

The dissenting court of appeals justice would have held the evidence sufficient for the trial court to find that Father had endangered the children.[19] The dissent pointed to *Boyd*, in which this Court held that endangering conduct need not be directed at the child and need not result in actual injury to the child.[20] Instead, a factfinder may infer endangerment from a course of parental misconduct that places the child's physical or emotional well-being at risk.[21]

We granted the Department's petition for review.

## II

We review de novo the court of appeals' interpretation of "endanger" in Family Code section 161.001.[22] When reviewing whether the evidence is legally sufficient to support termination of parental rights, we "view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility," and dealt the closest with the evidence at hand.[23] An appellate court "cannot substitute [its] judgment for the factfinder's" when considering the credibility of the evidence presented.[24] "[T]he appellate standard for reviewing termination findings is whether the evidence is such that a

---

[19] *Id.* at 556 (Zimmerer, J., dissenting).

[20] *Id.* (citing *Boyd*, 727 S.W.2d at 533).

[21] *Id.*

[22] *See Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019) ("Statutory interpretation involves questions of law that we consider de novo.").

[23] *In re J.F.-G.*, 627 S.W.3d 304, 315 (Tex. 2021).

[24] *Id.* at 316.

factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations."[25]

**A**

We begin with subsection (P), which provides a ground for termination based on clear and convincing evidence that the parent "used a controlled substance . . . in a manner that endangered the health or safety of the child" and failed to complete substance abuse treatment or continued to abuse a controlled substance after completing treatment.[26] Father confines his legal-sufficiency challenge to the endangerment element; he raises no challenge to the treatment element found in (P).

Father contends that the Department failed to show any connection between his drug use and harm to the children's health and safety, rendering the evidence insufficient for termination under (P). Father further argues that if (P) permits termination for drug use in a *manner* that endangers a child, then some illegal drug use must not rise to that level. For termination to be appropriate, Father argues, the Department must prove a danger beyond any created from illegal drug use alone. Only a direct link between the drug use and harm to the child's health and safety can satisfy this requirement.

The Department responds that the trial court reasonably could have found that Father's ongoing use of illegal drugs, knowing his parental rights were at risk, constitutes drug use "in a manner" that

---

[25] *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

[26] Tex. Fam. Code. § 161.001(b)(1)(P).

endangered his children and that such use prevented Father from seeing or appropriately caring for his three children. The Department argues that Father's positive test for methamphetamine while he was the sole caregiver for the children at the time of the first removal, Father's drug-concealing visitor in the house with the children at the time of the second removal, and Father's refusal to take multiple court-ordered drug tests demonstrate an endangering course of conduct.

We have never interpreted "endangered" in subsection (P). However, we have interpreted "endanger" and "endangers" in subsections (D) and (E).[27] When the Legislature uses substantially the same words and phrases in a statute, subsequent uses of that same word in the same subject area ordinarily carry the same meaning.[28] This rule is especially true when a judicial interpretation of the word exists.[29]

The Legislature deployed "endangered" in ground (P) nearly ten years after the Court interpreted "endanger" for grounds (D) and (E) in *Boyd*.[30] We thus give "endangered" in (P) the meaning we assigned "endanger(s)" in *Boyd*. In *Boyd*, our Court held that a parent's endangering conduct need not "be directed at the child or that the child actually suffers injury."[31] Instead, endangerment encompasses a larger array of conduct that "expose[s a child] to loss or injury" or

---

[27] *Id.* § 161.001(b)(1) (D), (E), (P).

[28] *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647 (Tex. 2020).

[29] *Id.*

[30] Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, 1997 Tex. Gen. Laws 2012, 2015.

[31] 727 S.W.2d at 533.

13

"jeopardize[s]" the child. [32] This definition matches the ordinary meaning of endangerment, which does not require actual harm. [33] A factfinder may infer endangerment from "a course of conduct" that presents substantial risks to the child's physical or emotional well-being—the focus of grounds (D) and (E)—or to the child's health and safety—the focus of ground (P).[34] Those risks can be developed by circumstances arising from and surrounding a parent's behavior. Such risks must be more than "a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."[35]

We applied *Boyd*'s endangerment standard to evaluate a parent's drug use in *In re J.O.A.*, a case that postdates the addition of ground (P). In *J.O.A.*, the Department removed three children from their parents after the youngest two children, twins, tested positive for cocaine at birth.[36] The parents' rights were terminated at trial for the twins but not for the oldest child. [37] On appeal, the mother's termination was upheld, but the father's was reversed.[38] The court of appeals reasoned that the twins, removed from their father at birth, were never in any danger occasioned by their father's drug use.[39] Our Court reversed the

---

[32] *Id.*

[33] *See id.* (looking to dictionary definitions of "endanger").

[34] *See id.* at 534.

[35] *Id.* at 533.

[36] 283 S.W.3d at 340.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 345.

court of appeals' judgment, holding that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct," even though the twins were not in the father's care.[40]

The father in *J.O.A.* "admitted to daily marijuana use," though not to use in front of his oldest child.[41] The parents had a history of domestic violence, and the father often allowed his daughter to stay alone with the mother "although he presumably knew this was not in their daughter's best interests" given the mother's known drug use.[42] As in this case, the father missed multiple drug tests after the children's removal, and he "tested positive for marijuana shortly before the final hearing commenced."[43] Though the father had "attended a substance abuse program and parenting classes" and "obtained steady employment, improved housing, and reliable transportation for his children," we held that "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."[44] The father's course of conduct permitted a reasonable factfinder to find endangerment by clear and convincing evidence.

*J.O.A.* confirms that endangerment does not require a parent's drug use to directly harm the child. Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a

---

[40] *Id.*

[41] *Id.* at 346.

[42] *Id.*

[43] *Id.*

[44] *Id.*

factfinder to reasonably find endangerment. Because the Legislature chose to use the word "endangered" in ground (P) in a manner similar to its use in grounds (D) and (E), the *Boyd* and *J.O.A.* standard for endangerment applies to the effects of a parent's drug use on a child's health and safety under (P).

We hold that the court of appeals erred in requiring direct evidence that Father's drug use resulted in physical injury to his children. The court of appeals' narrow definition of endangerment diverges from the ordinary meaning of "endanger" and our Court's precedent construing the term, which permits a factfinder to infer a risk of harm from parental conduct that, while not directed toward the child, presents a substantial risk to the child's health and safety.[45]

While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in

---

[45] We disapprove of the court of appeals' direct-harm holding in *L.C.L.* and cases in which that holding has been cited with approval. *See, e.g.*, *In re K.H.*, No. 10-21-00073-CV, 2021 WL 4080261, at *7 (Tex. App.—Waco Sept. 8, 2021, pet. denied) (citing to the direct-harm standard from *L.C.L.* in holding "drug use alone is insufficient to support a finding of an endangering course of conduct").

*L.C.L.* conflicted with other appellate courts when it was decided. *See In re L.C.L.*, 629 S.W.3d 909, 910 (Tex. 2021) (Lehrmann, J., concurring in the denial) (listing conflicting precedent in other courts of appeals). We agree with those courts holding that endangerment may be inferred from a course of parental conduct that creates a serious risk to a child's physical or emotional well-being. *See, e.g.*, *D.H. v. Tex. Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.) (disagreeing with the holding in *L.C.L.* that "direct evidence is required to show a causal link between drug use and endangerment").

isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."[46]

## B

Applying the *Boyd* standard for endangerment to the drug-use termination ground (P), we consider the sufficiency of the drug-use-related evidence in this case. A factfinder could find that the manner of Father's drug use endangered the health or safety of his children. Father was the only present parent of the children at the time of the first removal.[47] Grandmother refused to take possession of the children at that time. Father used felony-level drugs as the primary caregiver of the children when there were no other relatives willing to care for them. In Texas, possession of methamphetamine is at least a state jail felony.[48]

At or around that time, Father and the children were living in Father's car. Father's homelessness and employment difficulties have a close temporal relationship with his drug use, and a factfinder could reasonably infer Father's difficulties in providing shelter and support

---

[46] *J.O.A.*, 283 S.W.3d at 345. The *J.F.-G.* Court also looked to surrounding, related conduct when determining that a parent's incarceration, in context, helped demonstrate endangerment. *See* 627 S.W.3d at 315 ("[M]ultiple criminal episodes of escalating seriousness—together with the duration and consequences of the incarceration, is relevant when the resulting abandonment presents a risk . . . to a child's physical or emotional well-being.").

[47] In testimony, Father claimed that Mother had abandoned the family when the twins were less than a year old and that he cared for the children on his own.

[48] Tex. Health & Safety Code §§ 481.102, .115.

17

for his three very young children were related to his drug use. Father's continued lack of housing and ability to support his children exemplify risks that a pattern of drug use can create. A court need not require physical injury from these risks to materialize to find that the children's health and safety have been endangered by them; a pattern of illegal drug use in such a context is evidence from which a factfinder may infer endangerment. Appropriate deference to the factfinder "assume[s] that the factfinder resolved disputed facts in favor of its finding"; a reviewing court can set aside findings only if "no reasonable factfinder could form a firm belief or conviction" in those findings.[49] Our opinion does not render the clear-and-convincing-evidence standard toothless; instead, it properly defers credibility determinations to factfinders at the trial court level, who most closely interact with the witnesses.[50]

---

[49] *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[50] The dissent would foreclose a factfinder from relying on inferences from the facts to find that clear and convincing evidence established endangerment. Reviewing courts, however, must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence. *See In re Z.N.*, 602 S.W.3d 541, 548 (Tex. 2020). Such inferences must be reasonable and based on other facts proved. *See In re E.N.C.*, 384 S.W.3d 796, 806 (Tex. 2012) ("Deportation flowing from an unknown offense occurring many years earlier cannot satisfy the State's burden of proving by clear and convincing evidence that a parent engaged in an endangering course of conduct, nor can mere guesswork undergird such a finding."). In this case, for example, the factfinder could have disbelieved grandmother's statements at trial as to her present ability to care for the children, given her refusal to do so on two other occasions and lack of communication with the Department and the children after their second removal. The record supports a factfinder's determination beyond mere guesswork that Father's drug use, housing difficulties, financial instability, six-month absence from the children's lives,

## III

Although termination under (P) is sufficient to reverse the judgment of the court of appeals, we must also review termination under subsections (D) and (E) because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M).[51]

### A

Father argues that the Legislature's addition of (P) in 1997 renders drug use an insufficient basis to support termination under (D) and (E). We disagree that the inclusion of (P) forces the exclusion of drug-related conduct as endangering conduct under (D) and (E). Newly added specific grounds for termination under section 161.001 do not expressly circumscribe the scope of provisions (D) and (E).[52] "[C]onduct that might endanger a child's physical or emotional well-being" is relevant for termination under subsections (D) and (E) concomitantly with a more specifically applicable subsequent ground.[53] The

---

and lack of familial support, among other things, resulted in an overarching endangering environment for these children.

[51] *See In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019); *see also* Tex. Fam. Code § 161.001(b)(1)(M).

[52] *See J.F.-G.*, 627 S.W.3d at 313–14. We held in *J.F.-G.* that the incarceration-based ground for termination in section 161.001 did not "exclusively define the circumstances in which a parent's crimes or incarceration can support termination." *Id.* at 314. When the Legislature added an incarceration-specific ground for termination, it did not rewrite subsection (E) to exclude conduct that leads to incarceration. Likewise, subsection (P) does not exclusively define the circumstances in which drug use can result in termination.

[53] *Id.* at 313–14.

Legislature could have carved out drug use from grounds (D) and (E) when adding ground (P) to section 161.001, but it did not. By adding ground (P), "the Legislature has expanded the grounds for termination, not curtailed them."[54] Drug-related conduct considered under (P) thus may also inform the (D) and (E) termination analysis.[55]

Father also relies on subsection 261.001(1) of the Family Code, which defines drug abuse in the mandatory-reporting context. That subsection defines "abuse" in part as "the current use by a person of a controlled substance . . . in a manner or to the extent that the use results in physical, mental, or emotional injury to a child." [56] The *abuse*-reporting statute's explicit requirement of materialized harm is not a reason to depart from our Court's longstanding, plain-meaning definition of *endangerment*.[57]

---

[54] *Id.* at 314.

[55] *See J.O.A.*, 283 S.W.3d at 345–46 (considering a parent's drug use when terminating parental rights under (D) and (E)). The fact that the parent's conduct in this case, and perhaps in most cases involving drug use, could result in termination under (D), (E), and (P) does not render (P) superfluous. At a minimum, termination under (D) or (E) provides the predicate for termination in subsequent cases under subsection (M), while (P) is available without the same ramifications. Whether a parent whose drug use is ameliorated by completing court-ordered treatment could nonetheless have his or her rights terminated under (D) and (E) without any evidence of additional endangering conduct is not before us.

[56] Tex. Fam. Code § 261.001(1)(I).

[57] The Family Code places the requirement to report on "[a] person having reasonable cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect." Tex. Fam. Code § 261.101(a). A direct-harm definition of abuse in that context might reasonably heighten the standard for creating an obligation to report. The

**B**

On review, the court of appeals is "required to view the facts in a light favorable to the findings of the trial judge"[58] and reverse only if "no reasonable factfinder could form a firm belief or conviction" that its finding is true.[59] In reversing the trial court's termination judgment, the court of appeals relied on the caseworker's testimony that there was no evidence Father used drugs around the children; that he had a good, loving relationship with the children; and that the caseworker had not witnessed Father endangering the children. As the dissenting court of appeals justice observed, however, the court ignored evidence the trial court could have credited, including the caseworker's testimony that Father had refused drug testing for nearly a year; had stopped visiting the children and had not inquired about their well-being; and had not shown he could provide stable living or employment arrangements.

The court of appeals should not have ignored the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial. The trial court reasonably could have inferred that this conduct, in the aggregate, endangered the children's physical and emotional well-being. Whether Father's bond with the children warrants further work toward reunification is most appropriately

---

plain meaning of "abuse" includes direct harm in a way the plain meaning of "endanger" does not.

[58] *J.F.-G.*, 627 S.W.3d at 315.

[59] *J.F.C.*, 96 S.W.3d at 266.

addressed in a best-interest determination—an issue we are remanding to the court of appeals.

Father's positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop Father's continued pattern of drug use. The family service plan, which Father acknowledged at the outset, deemed a failure to test as a positive test. With this testing information in the record, a factfinder could infer that Father used drugs while his termination proceedings were pending. Father's failure to test coincided with his disengagement from communications, services, and the children themselves, posing a substantial risk to the children's emotional well-being. [60] Accordingly, we hold that legally sufficient evidence supports the trial court's determination that Father's conduct endangered the children under (D) and (E).

## IV

Father also challenged the trial court's best-interest findings in the court of appeals. That court did not reach Father's challenge, and the parties did not brief the issue before us. We therefore remand this case to the court of appeals for a best-interest determination.[61]

\*     \*     \*

---

[60] *See J.O.A.*, 283 S.W.3d at 346 (listing father's use of marijuana "shortly before the final hearing" as evidence in favor of termination).

[61] Because we affirm termination on the (D), (E), and (P) grounds, we need not reach the Department's other challenges, including: (1) the court of appeals' refusal to consider the Department's cross-point; (2) the reversal of the Department's appointment as managing conservator; and (3) the court of appeals' decision to render judgment rather than remand.

A parent's pattern of illegal use of a controlled substance like methamphetamine supports a finding of endangerment under (P) when the evidence shows it adversely affected the parent's ability to parent, presenting a substantial risk of harm to the child's health and safety. Such drug-use evidence is also relevant under the (D) and (E) grounds for termination. When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E). We reverse the judgment of the court of appeals and remand to that court to review the trial court's best-interest finding.

_____
Jane N. Bland
Justice

**OPINION DELIVERED:** March 22, 2024

23